**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALYSSA S. PETERSON,<br>　　　　Plaintiff, | No. 3:20-cv-781 (SRU) |
| 　　　　v. | |
| WELLS FARGO BANK, N.A.,<br>　　　　Defendant. | |

## RULING ON MOTIONS TO DISMISS

In 2008, plaintiff Alyssa Peterson ("Peterson") defaulted on a loan collateralized by a family home in North Carolina. The holder of the promissory note, defendant Wells Fargo Bank, N.A. ("Wells Fargo"), sought to exercise a power-of-sale provision in the deed of trust and execute a nonjudicial foreclosure. Peterson declared bankruptcy, and the foreclosure proceeding was stayed by operation of law. After curing the pre-bankruptcy default through her bankruptcy plan, Peterson soon defaulted again. In 2018, the bankruptcy stay was lifted and Wells Fargo sought to proceed with the foreclosure sale. Before the foreclosure sale occurred, Peterson paid off the note and Wells Fargo terminated the foreclosure proceeding.

Two years later, Peterson, proceeding *pro se*, filed the instant suit against Wells Fargo, raising several claims arising out of Wells Fargo's decision to proceed with the foreclosure sale in 2018. Before me are Wells Fargo's two motions to dismiss Peterson's Second Amended Complaint for failure to plead sufficiently pursuant to Rule 9(b) and failure to state a colorable claim under Rule 12(b)(6). Docs. No. 27, 35. For the reasons that follow, I grant the motions to dismiss and dismiss Peterson's claims with prejudice.

I.     **Background**[1]

A.  Allegations

Peterson is a resident of Connecticut who, jointly with family members, owns a parcel of real property located at 213 Atlantic Avenue, Kure Beach, North Carolina ("Kure Beach Property").  Second Amended Complaint ("SAC" or "the operative complaint"), Doc. No. 34, at 3 ¶ 12.

On October 16, 2006, Peterson obtained a home loan in the original amount of $100,000 from Ohio Savings Bank; she signed the note as the sole borrower, secured by a deed of trust on the Kure Beach Property ("Note" and "Deed of Trust").  *See id.* at 3 ¶ 13; *see also* Note and Deed of Trust, *In re Peterson*, Dkt. No. 2:10-bk-23429 (Bankr. D. Conn. Aug. 15, 2017) ("*Bankruptcy Case*"), Doc. No. 538-1.  Ohio Savings Bank thereafter assigned the deed of trust to Wells Fargo.  Doc. No. 34, at 34.

1.  *The 2008 Pre-Petition Default and 2009 Authorization of Foreclosure Sale*

In 2008, the Note went into default ("Pre-Petition Default").  SAC, Doc. No. 34, at 4 ¶ 14; Affidavit of Default, *Foreclosure Case* (N.C. Super. Ct. Oct. 19, 2009 (averring that Peterson's last payment was in the payment period ending October 31, 2008).  As a result, Wells Fargo initiated a collection file bearing case number 09-10856 on the Kure Beach Property.  SAC, Doc No. 34, at 5-6 ¶ 25.  Thereafter, on June 16, 2009, Wells Fargo's Substitute Trustee Brock & Scott, PLLC ("Substitute Trustee") initiated a special proceeding for a nonjudicial foreclosure in the General Court of Justice, Superior Court Division of New Hanover County,

---

[1] Although I already recited allegations in my prior ruling on the defendant's motion to dismiss, I re-recite them to reflect Peterson's Second Amended Complaint and any additional allegations on which I now rely.  In addition, I note that I obtained a copy of the file associated with Peterson's North Carolina foreclosure case, Docket Number 09 SP 681, from the Clerk of the General Court of Justice, Superior Court Division of New Hanover County, North Carolina.  This file is available to the parties and to the public.  I reference filings from the foreclosure proceeding and from Peterson's bankruptcy proceeding.

North Carolina ("Superior Court").  *See generally In re: Foreclosure of Real Property Under Deed of Trust from Alyssa S Peterson et al*., in the original amount of *$100,000, payable to Ohio Savings Bank, dated October 16, 2006 in Book 5092 at Page 2396, New Hanover County Registry*, Dkt. No. 09 SP 681 (N.C. Super. Ct. June 16, 2009) ("*Foreclosure Case*").

On October 19, 2009, the Clerk of Superior Court of New Hanover County, "having heard evidence and examined the appropriate affidavits and certified copies of documents," issued an Order to Allow Foreclosure Sale concluding that: Wells Fargo was the holder of the Note; the Note was in default; Wells Fargo had the right to foreclose under a power-of-sale pursuant to the Deed of Trust; notice of a hearing was served on the record owners of the property and others; statutory requirements were met; Peterson showed no valid reason why foreclosure should not commence; and the Substitute Trustee could proceed to foreclose on the property.  Order to Allow Foreclosure Sale, *Foreclosure Case* (N.C. Super. Ct. Oct. 19, 2009) ("Clerk's Order to Allow Foreclosure Sale" or "Clerk's Order").

On October 27, 2009, Peterson appealed the Clerk's Order.  *See* Notice of Appeal, *Foreclosure Case* (N.C. Super. Ct. Oct. 27, 2009).

On December 7, 2009, the North Carolina Superior Court held a hearing regarding Peterson's foreclosure appeal.  At the hearing, Judge Cobb of the Superior Court evaluated the evidence *de novo* and made the following findings of fact:

> 1. Alyssa Peterson (herein "Respondent") executed a Note in favor of Ohio Savings Bank.  Alyssa Peterson . . . executed a Deed of Trust in favor of Ohio Savings Bank secured by the property described in said Deed of Trust. . . .  The Deed of Trust contains a power of sale provision that authorized the holder of the note to foreclose; and
>
> 2. A valid debt exists and is owed by the Respondent to Wells Fargo Bank, N.A. successor by merger to Wells Fargo Home Mortgage, Inc.; and
>
> 3. The Respondent is in default of her debt under the Note and Deed of Trust; and

4. Proper notice was given to all Parties that were required to receive Notice pursuant to N.C.G.S. §45-21.16.  The Respondent . . . received notice under N.C.G.S. §45-21.16.  All parties received notice of this hearing in accordance with the Rules of Civil Procedure.  The Respondent appeared and argued on the merits during the hearing held on December 7, 2009; and

5. The Court finds that Wells Fargo Bank, N.A. . . . is the current owner and holder of the note and deed of trust at issue in this matter; and

6. The Respondent was mailed the pre-foreclosure notice required under N.C. Gen. Stat. §45-102 more than 45 days prior to the filing of the Notice of Hearing; and

7. The pre-foreclosure notice requirements under N.C. Gen. Stat. §45-102 were met. . . .

Order, *Foreclosure Case* (N.C. Super. Ct. Dec. 7, 2009) ("Superior Court's Order Authorizing Foreclosure Sale").  Based on those findings of fact, Judge Cobb concluded that the Substitute Trustee was "entitled to proceed to a foreclosure sale under the terms of the above-described Deed of Trust"; therefore, he authorized Wells Fargo to give notice of and conduct a foreclosure sale.  *Id.*  The Substitute Trustee noticed a sale date of June 25, 2010.  Amended Notice of Foreclosure Sale, *Foreclosure Case* (N.C. Super. Ct. May 28, 2010).

Before the scheduled foreclosure sale took place, the Substitute Trustee notified the Superior Court that Peterson had filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code.  Notice of Bankruptcy Petition, *Foreclosure Case* (N.C. Super. Ct. June 28, 2010) (citing *In re Peterson*, Dkt. No. 2:10-bk-22129 (Bankr. D. Conn. 2010)).[2]  Due to the bankruptcy petition, the Substitute Trustee indicated that it was "unable to proceed with the foreclosure action as a matter of law."  *Id.*  However, the Substitute Trustee expressly indicated

---

[2] The Bankruptcy Court closed Peterson's initial bankruptcy filing on July 30, 2010, due to Peterson's failure to file schedules, statements, and a plan hearing. *See In re Peterson*, Dkt. No. 2:10-bk-22129, Doc. No. 25 (Bankr. D. Conn. July 30, 2010).  She subsequent initiated a second proceeding.

that it was "neither dismissing [the] action nor waiving any rights which it has under this foreclosure." *Id.*

### 2. *The 2010 Bankruptcy Case and the 2013 Cure*

On October 5, 2010, Peterson filed a bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut. *See In re Peterson*, Dkt. No. 2:10-bk-23429, Doc. No. 2. (Bankr. D. Conn. 2010) ("*Bankruptcy Case*").

Thereafter, Wells Fargo filed a proof of claim, Claim Number 4, to recover the indebtedness of the Note. *See* SAC, Doc. No. 34, at 4 ¶ 14. Wells Fargo asserted that Peterson owed $136,273.73. *Bankruptcy Case*, Doc. No. 85. Peterson, through counsel, objected to the claim. SAC, Doc. No. 34, at 4 ¶ 15; *Bankruptcy Case*, Doc. No. 85.

The Bankruptcy Court issued an order scheduling an evidentiary hearing to determine the amount of Wells Fargo's claim. *See Bankruptcy Case*, Doc. No. 223. In that same order, the Bankruptcy Court determined that, in light of Superior Court's Order Authorizing Foreclosure Sale, the doctrine of collateral estoppel precluded the parties from relitigating the issues decided by the Superior Court. *See* SAC, Doc. No. 34, at 4 ¶ 16; *Bankruptcy Case*, Doc. No. 223, at 9-10. Because the Superior Court did not and could not have decided the amount of the debt in question, however, the Bankruptcy Court held that neither collateral estoppel nor res judicata precluded it from determining that issue. *See* SAC, Doc. No. 34, at 4 ¶ 17; *Bankruptcy Case*, Doc. No. 223, at 9–10.

Prior to the hearing, on March 7, 2013, Peterson filed her Fifth Amended Chapter 13 Plan ("Bankruptcy Plan" or "the Plan"), which provided for payment of the pre-petition arrearage on the Kure Beach Property through the Plan, and maintenance of post-petition payments by

Peterson outside of the Plan.  *See Bankruptcy Case*, Doc. No. 245, at 5, 6.  On March 8, 2013, the Bankruptcy Court confirmed the Plan.  *See Bankruptcy Case*, Doc. No. 247.

Following the hearing, Peterson and Wells Fargo notified the Bankruptcy Court that they were in the process of finalizing a settlement agreement.  *See* SAC, Doc. No. 34, at 5 ¶ 19; *Bankruptcy Case*, Doc. No. 279, at 1.  On September 10, 2013, Wells Fargo filed a second amended proof of claim, which set forth a stipulated pre-petition arrearage amount of $29,046.54, and a total debt of $125,043.76.  *See* SAC, Doc. No. 34, at 5 ¶ 19; Proof of Claim, Doc. No. 34, at 23.  The claim provided that the amount of arrearage as of the petition date was "per settlement."  *Id.*  Peterson thereafter withdrew her objection to Wells Fargo's claim.  *See* Doc. No. 34, at 5 ¶ 20; *Bankruptcy Case*, Doc. No. 295.

On April 15, 2013, the stipulated Pre-Petition Default arrearage of $29.046.54 was cured by disbursement by the Chapter 13 Standing Trustee ("Bankruptcy Trustee").  SAC, Doc. No. 34, at 5 ¶ 21; *Bankruptcy Case*, Doc. No. 616, at 8.  The Bankruptcy Trustee had, in fact, made an overpayment of $9,880 to Wells Fargo.  SAC, Doc. No. 34, at 5 ¶ 23.  The overpayment was later returned to the Bankruptcy Trustee.  *Id.*

For some period of time after Peterson satisfied her obligation to cure the Pre-Petition Default, she briefly maintained her obligation to keep current on her post-petition payments to Wells Fargo outside the Plan.

### 3.   *The Subsequent Default and Termination of the Stay*

At some point thereafter, Peterson again defaulted ("Post-Petition Default").  SAC, Doc. No, 34, at 5 ¶ 24.  As a result, on August 15, 2017, Wells Fargo filed a motion to lift the bankruptcy stay on the Kure Beach Property pursuant to 11 U.S.C. § 362.  *See id*. at 5 ¶ 24; *Bankruptcy Case*, Doc. No. 538.  In its motion, Wells Fargo represented that Peterson had

defaulted on November 1, 2013 and had subsequently failed to make any monthly payments, with the post-petition arrearage totaling $48,992.01. *Bankruptcy Case*, Docs. No. 538, at 5 ¶ 8; 538-2, at 2, 6, 35; 578 ("Ms. Peterson admitted during the October 4th hearing that she has not made a single payment to Wells Fargo on account of the mortgage on the Kure Beach property since 2014, more than three years earlier."). Peterson opposed the motion, and the Bankruptcy Court held a hearing on October 4, 2017. *Bankruptcy Case*, Docs. No. 553, 554. The motion was taken under advisement.

On November 3, 2017, before the Bankruptcy Court issued a decision but after sixty days had passed, Wells Fargo filed a notice of termination of the automatic stay by operation of law pursuant to 11 U.S.C. § 362(e)(2). *Bankruptcy Case*, Doc. No. 557. Peterson sought the entry of a preliminary injunction re-imposing the automatic stay, but the Bankruptcy Court denied the requested relief. *Bankruptcy Case*, Doc. No. 578.

Several months later, on March 26, 2018, Wells Fargo requested entry of an order terminating the co-debtor stay, to which no co-debtor objected. *Bankruptcy Case*, Docs. No. 597, 600. On April 6, 2018, the Bankruptcy Court granted the motion, thereby terminating the co-debtor stay. *See Bankruptcy Case*, Doc. No. 600.

In May 2018, Peterson received a call from her brother asking about the status of the mortgage, noting that he had received a phone solicitation from an individual who was interested in buying the Kure Beach Property "pre-foreclosure." SAC, Doc. No. 34, at 6 ¶ 29. He later told Peterson that he learned that the solicitation was related to Wells Fargo's old collection file. *Id.* at 6 ¶ 30.

Thereafter, on May 18, 2018, Peterson filed a motion for a stay pending appeal in Bankruptcy Court and moved for an "immediate cease and desist order or release" preventing

Wells Fargo from proceeding with the foreclosure sale, then scheduled for June 8, 2018.

*Bankruptcy Case*, Doc. No. 620-21.

On May 23, 2018, Peterson received an amended notice of foreclosure sale, which cited

to the initial collection file number (09-10856) and the initial foreclosure case number (09 SP

681).  SAC, Doc. No. 34, at 7 ¶ 34; Doc. No. 34, at 42.  The notice indicated that the sale of the

Kure Beach Property was scheduled for June 8, 2018.  *Id*.

On May 25, 2018, the Bankruptcy Court denied Peterson's first motion for a stay pending

appeal.  *Bankruptcy Case*, Doc. No. 622.  In the order, the Bankruptcy Court declined to decide

whether it was proper for Wells Fargo to proceed in an action that was initiated pre-petition,

explaining that the issue was not properly before the court on the motion to stay and that "[s]uch

an argument is better suited for resolution before the North Carolina state court."  *Id.* at 6.  The

Bankruptcy Court added:

> The Co-Debtor stay was terminated and Wells Fargo may exercise
> whatever remedies it is entitled to under state law.  The propriety of those
> remedies, or the procedural requirements for those remedies, is for the
> state court to determine.  Any objection to Wells Fargo's choice of
> remedies should be addressed before the state court in North Carolina.

*Id.* at 7.

Also on May 25, 2018, and for substantially similar reasons, the Bankruptcy Court denied

Peterson's second motion for an immediate order.  *Bankruptcy Case*, Doc. No. 623.  There, the

Bankruptcy Court held that injunctive relief was not warranted, explaining again that "because

there is presently no bankruptcy stay in effect regarding the Property, Ms. Peterson is seeking

assistance from the wrong court.  If, as she asserts, the foreclosure auction or sale process is

premised on a prepetition mortgage default that she has already cured through her Chapter 13

plan, then she needs to address the North Carolina state court on that issue."  *Id.* at 2.  The court

added: "[t]his court does not have the power or authority to enter an injunction regarding the

8

North Carolina state court foreclosure or sale process," and directed Peterson to the North

Carolina state court for relief. *Id.* at 3.  The Bankruptcy Court further noted that the Bankruptcy

Plan contemplated that Peterson would make periodic post-petition mortgage payments directly

to Wells Fargo, and that Peterson conceded during an October 4, 2017 hearing that the most

recent post-petition mortgage payment to Wells Fargo had occurred in 2014. *Id.* at 2.

On June 4, 2018, Wells Fargo advised Peterson that an injunction was not necessary and

that Wells Fargo had authorized postponement of the sale at the courthouse for 60 days pending

an analysis of Peterson's claims.  SAC, Doc. No. 34, at 9 ¶ 41.  Wells Fargo later reported that it

wanted the mortgage to be repaid in full immediately or else the sale would go forward under the

initial case number. *Id.* at 9 ¶ 45.  After the outstanding debt was paid as a lump sum payment,

the foreclosure sale was cancelled. *Id.* at 10 ¶ 50.  On July 13, 2018, Wells Fargo notified the

Superior Court that it was withdrawing the *Foreclosure Case*.  Withdrawal of Notice of

Hearing/Termination, *Foreclosure Case* (N.C. Super. Ct. July 13, 2018).

On August 3, 2018, noting that the maximum five-year period to make Chapter 13 plan

payments had elapsed and that Peterson had indicated that she did not intend to make the final

payments, the Bankruptcy Court closed the *Bankruptcy Case* without discharge. *See Bankruptcy

Case*, Doc. No. 658.

B.  Procedural History

Peterson initiated the instant lawsuit on June 6, 2020 against Wells Fargo.  Her initial

complaint set forth seven counts: (1) declaratory judgment arising out of violations of the Full

Faith and Credit Act, 28 U.S.C. § 1738, *et seq*.; (2) declaratory judgment arising out of violations

of "federal protection of a settled pre-petition collection action" under 11 U.S.C. § 362(a)(6); (3)

violations of the Connecticut Unfair Trade Practices Act; (4) breach of contract; (5) breach of the

implied covenant of good faith and fair dealing; (6) negligent misrepresentation; and (7)

wrongful foreclosure.  *See* Compl., Doc. No. 1, at 8-18.  Peterson also appeared to assert a claim

under the Fair Debt Collections Practices Act, 15 U.S.C. § 1692, *et seq*.  *See id.* at 2 ¶ 6.  She

principally sought declaratory judgment, monetary and punitive damages, and costs.  *See id.* at

19.

On August 12, 2020, Wells Fargo filed its first motion to dismiss the complaint in its

entirety on Rule 12(b)(1) and Rule 12(b)(6) grounds.  *See* Docs. No. 17, 18.  Peterson opposed

the motion on August 28, 2020, and Wells Fargo replied on September 11, 2020.  *See* Docs. No.

20, 21.  On March 17, 2021, I granted Wells Fargo's motion to dismiss.  Doc. No. 22.  I

dismissed the Full Faith and Credit Act claim and declaratory judgment with prejudice, because

neither gave rise to a cause of action; and I dismissed the bankruptcy-related claims for lack of

jurisdiction.  *Id.* at 9-10.  I dismissed the remaining claims without prejudice, concluding that

Peterson had not sufficiently stated allegations arising under the Fair Debt Collection Practices

Act, 15 U.S.C. § 1692, *et seq*., and declining to exercise supplemental jurisdictions over her state

law claims.  *Id.* at 11-17.

On April 16, 2021, Peterson filed an amended complaint.  Doc. No. 24.  Shortly

thereafter, on May 14, 2021, Wells Fargo moved to dismiss the amended complaint.  Doc. No.

27.  On June 7, 2021, Peterson moved for leave to amend the amended complaint.  Doc. No. 31.

I granted Peterson leave to amend and indicated that I would treat Wells Fargo's motion to

dismiss, Doc. No. 27, as against the second amended complaint.  Doc. No. 33.

On June 16, 2021, Peterson filed the Second Amended Complaint.  SAC, Doc. No. 34.

In it, she principally revised the portions of the complaint addressing jurisdiction.  *Id.* at 3.  She

asserted five causes of action, all arising under state law: (1) violations of the Connecticut Unfair

Trade Practices Act; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) negligent misrepresentation; and (5) wrongful foreclosure.  *See* SAC, Doc. No. 34, at 11-21.  The complaint sought monetary and punitive damages, and costs.  *See id.* at 21.

Wells Fargo then filed a Motion to Dismiss the Second Amended Complaint, Doc. No. 35, which incorporated by reference its pending Motion to Dismiss the Corrected Amended Complaint and accompanying memorandum of law, Docs. No. 27, 28.  Peterson filed an opposition on July 16, 2021.  Doc. No. 38.  Wells Fargo did not file a reply.

On November 15, 2021, I held a hearing on the motions to dismiss and took them under advisement.  Doc. No. 46.  At Peterson's request, I permitted her to submit additional documents supplementing the record.  *Id.*  Both at the hearing and on the docket thereafter, I advised that I may convert the motions to dismiss under Federal Rule of Civil Procedure 12 into motions for summary judgment under Rule 56 after reviewing the documents supplementing the record. Doc. No. 47.

On November 30, 2021, Peterson submitted twenty supplemental documents.  Doc. No. 48.  On December 11, 2021, Wells Fargo responded.  Doc. No. 53.

Now before me are Wells Fargo's motions to dismiss, Docs. No. 27, 28, and accompanying memoranda of law, Docs. No. 35, 36, which incorporate by reference its claims in its prior motion to dismiss the original complaint and accompanying memorandum of law, Docs. No. 17, 18.

## II.      Standards of Review

### A.  Motions to Dismiss

#### 1.  *Federal Rule of Civil Procedure 12(b)(1)*

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A party that moves to dismiss for lack of subject matter jurisdiction "may refer to evidence outside the pleadings." *Id.*  To survive a motion brought under Rule 12(b)(1), a plaintiff "has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists." *Id.*

#### 2.  *Federal Rule of Civil Procedure 12(b)(6)*

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also*

*Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely."  *Id*. at 556 (internal quotation marks omitted).

## III.    Discussion

### A.  Threshold Issues

#### 1.  *Jurisdiction*

In their briefing regarding the motions to dismiss, the parties engaged in a lengthy colloquy regarding the basis for this Court's jurisdiction.  Peterson incorrectly asserts that this Court has jurisdiction arising under 28 U.S.C. § 1331; as Wells Fargo observes, there is no basis for federal question jurisdiction because the Second Amended Complaint only asserts state law causes of action.  Doc. No. 34, at 2 ¶ 7; Doc. No. 28, at 6.  I further agree with Wells Fargo that this Court has subject matter jurisdiction arising under 28 U.S.C. § 1332.  Doc. No. 28, at 9-13. The parties are completely diverse: Peterson is a citizen of Connecticut, and Wells Fargo is a citizen of South Dakota.  Doc. No. 34, at 2 ¶ 8; Doc. No. 28, at 11.  Although Peterson does not specifically plead an amount of damages sought, my view that the Second Amended Complaint states claims satisfying the amount-in-controversy requirement is legally supported.  *See, e.g., Guillory v. Allstate Ins. Co.*, 476 F. Supp. 2d 171, 172-73 (D. Conn. 2007).  Accordingly, this Court has diversity jurisdiction.

2. *Venue*

Venue is proper in a judicial district in which any defendant resides, if all defendants are residents of the state in which the judicial district is located; where a "substantial part of the events and omissions" giving rise to the claim occurred; or where a "substantial part of the property" that is the subject of the litigation is located. 28 U.S.C. § 1391. Peterson signed the Note in Connecticut, and the *Bankruptcy Case* proceeded in the District of Connecticut. Nevertheless, in my view, no showing of any of the standards for proper venue has been made. However, improper venue is a waivable issue, and any objection to venue is considered waived where not asserted in a defendant's responsive pleading, including a pre-answer motion to dismiss. *See* Fed. R. Civ. P 12(h)(1); 28 U.S.C. § 1406(b). Here, Wells Fargo has made no objection to the adequacy of this Court as the venue for these proceedings. Accordingly, this Court is deemed a proper venue.

3. *No Conversion to a Motion for Summary Judgment*

"[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988). However, a district court may consider certain materials without converting a motion to dismiss into one for summary judgment. Those materials include matters of which judicial notice may be taken, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in the complaint by reference, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted);

or any document that is not attached or incorporated by reference "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint," *id*. at 153 (citation and internal quotation marks omitted).

In determining whether conversion of a Rule 12(b)(6) motion into a Rule 56 motion is appropriate, "[t]he essential inquiry is whether the [plaintiff] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of reasonable opportunity to meet the facts outside the pleadings." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir. 1999) (internal quotation marks omitted); *see also In re G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985) ("A party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits . . . in support of and in opposition to a motion to dismiss. . . . Even where only the party moving to dismiss has submitted extrinsic material . . . , the opposing party may be deemed to have had adequate notice that the motion to dismiss would be converted. . . .") (citations omitted).

I conclude that would be entirely reasonable to convert Wells Fargo's motions to dismiss into motions for summary judgment. Both parties were on sufficient notice of the possibility, Peterson submitted additional materials to be considered by the court, and Wells Fargo was afforded the opportunity to respond with submissions of its own. Moreover, Peterson attached exhibits to the Second Amended Complaint and in opposition papers, in addition to supplementing the record after the hearing. Furthermore, both at the hearing and on the docket, I expressly warned that considering the supplemental record submission might lead to converting the motions to dismiss into motions for summary judgment. Therefore, the parties may not validly claim unfair surprise. *See Gurary,* 190 F.3d at 43.

Nevertheless, I decline to convert the motions to dismiss into motions for summary judgment.  I did not rely on the supplemental record submission nor Wells Fargo's reply in this opinion.  *See* Docs. No. 48, 53.  Apart from reciting the presence of the submissions in the procedural history of this proceeding, I make no further reference to the documents.  For the purposes of the rule, I "excluded" them.

In contrast, at times I rely on documents that Peterson appended to or referred to in the Second Amended Complaint.  For example, the Second Amended Complaint makes express reference to the Note and Deed of Trust.  *See* SAC, Doc. No. 34, at 3 ¶ 13 ("Plaintiff had signed a note . . . secured by a deed of trust . . . .").  I refer to the Note and Deed of Trust, an exhibit before the Bankruptcy Court, in this opinion.  *See* Note and Deed of Trust, *Bankruptcy Case,* Doc. No. 538-1.  In addition, because Peterson repeatedly refers to specific filings in both the Foreclosure and Bankruptcy Cases and I consider them constructively incorporated in her complaint, I obtained and employ those filings in this opinion.  *E.g.,* SAC, Doc. No. 34, at 4 ¶ 16 (citing to *Bankruptcy Case*, Doc. No. 223, and "an order entered in a North Carolina Superior Court on December 7, 2009"), 7 ¶ 34 ("Plaintiff received the 'AMENDED NOTICE OF FORECLOSURE. . . .'").  Other times, though sparingly, I rely on other records in those proceedings, which I may do pursuant to Federal Rule of Evidence 201.  *See* Fed. R. Evid. 201 (permitting judicial notice of documents that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Shmueli v. City of New York*, 424 F.3d 231, 233 (2d Cir. 2005) ("The New York State . . . prosecution of [the defendant] is a matter of public record, of which we take judicial notice.").

By excluding the supplemental record submission and relying on external material that either appears on the face of the complaint, is essential to the face of the complaint, or of which I

may take judicial notice, I need not convert the motions to dismiss into motions for summary judgment.  Therefore, I continue to designate this opinion as a ruling on the motions to dismiss and decline to convert it to a summary judgment ruling.

B.  The Motions to Dismiss

Peterson raises five causes of action, which I address in turn below.  Wells Fargo asserts that each claim is insufficiently pleaded because she fails to allege fraud with the requisite level of particularity under Federal Rule of Civil Procedure 9(b); that each claim is barred by the doctrine of quasi estoppel under North Carolina law, by res judicata, and by collateral estoppel; and that each claim fails a matter of law.  Wells Fargo requests that I dismiss each claim with prejudice.  After a thorough analysis that reaches beyond the parties' papers and addresses the additional documents described above, I agree with Wells Fargo's conclusion and dismiss Peterson's claims with prejudice.

1.  *Connecticut Unfair Trade Practices Act*

In Count One, Peterson alleges that Wells Fargo violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq*. ("CUTPA").  SAC, Doc. No. 34, at 11 ¶¶ 53-58.  Wells Fargo argues that Peterson's CUTPA claim fails to satisfy the heightened pleading for fraud and is barred for lack of subject matter jurisdiction.  Doc. 27, at 2.  I agree in part and disagree in part.

At the outset, I must address Peterson's factual allegations in connection with Count One.  Peterson "incorporates by reference" earlier allegations and asserts without much elaboration that Wells Fargo engaged in indeterminate "unfair or deceptive acts or practices" and "unfair competition."  SAC, Doc. No. 34, at 11 ¶ 54.  As a result, the factual allegations giving rise to the CUTPA claim are not clear.

17

In Wells Fargo's view, Peterson alleges that Wells Fargo engaged in unfair or deceptive practices by violating the bankruptcy stay. *See* Doc. No. 27, at 2; Doc. No. 28, at 15; Doc. No. 18, at 30). There is some, though limited, evidence supporting that construction on the face of the Second Amended Complaint. *E.g.*, SAC, Doc. No. 34, at 9 ¶ 44 ("Plaintiff's former bankruptcy attorney . . . defined Defendant's conduct as a probable violation of bankruptcy code 11 U.S.C. § 362(a)(6) that prevented post-petition actions for pre-petition collection matters previously adjudicated, settled and paid during prior valid automatic stay."). To any extent that Peterson's CUTPA claim arises from an alleged violation of the bankruptcy stay, this Court lacks jurisdiction and dismissal of the claim is warranted.[3] However, I consider Wells Fargo's analysis inapposite, because I do not interpret the Second Amended Complaint to state such a claim.

Peterson proceeds *pro se*, and I must construe her pleadings "liberally" and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quotation marks and citations omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Applying those principles, and with the benefit of Peterson's clarifying comments at the hearing, I construe the operative complaint to argue under several theories that Wells Fargo improperly "reinstated" the *Foreclosure Case* in 2018, which rendered the attempted foreclosure sale unfair or deceptive.

I restate Peterson's Count One allegations as I understand them. In 2009, the General Court of Justice, Superior Court Division of New Hanover County authorized Wells Fargo to

---

[3] The Second Circuit has held that the Bankruptcy Code preempts state law with respect to relief related to alleged violations of bankruptcy stays. *See E. Equip. & Servs. Corp. v. Factory Point Nat. Bank, Bennington*, 236 F.3d 117, 120–21 (2d Cir. 2001). Specifically, "[a]ny relief for violation of a stay must be sought in the Bankruptcy Court," rather than the district court, "which only has appellate jurisdiction over bankruptcy cases." *Id.* As the Second Circuit has made exceedingly clear, federal district courts "simply lack jurisdiction to hear claims asserting violations of the automatic stay that sound in state law." *Id.* at 121. Lacking jurisdiction, I must dismiss any claim arising out of purported violations of the bankruptcy stay.

proceed with a foreclosure sale on the Kure Beach Property based on Peterson's Pre-Petition

Default. S*ee* Clerk's Order to Allow Foreclosure Sale, *Foreclosure Case* (N.C. Super. Ct. Oct.

19, 2009) (referencing Affidavit of Default, *Foreclosure Case* (N.C. Super. Ct. Oct. 19, 2009));

Superior Court's Order Authorizing Foreclosure Sale, *Foreclosure Case* (N.C. Super. Ct. Dec. 7,

2009). That authorization, premised on the Pre-Petition Default, was stayed by the Bankruptcy

Court. When the Bankruptcy Trustee "settled and fully paid" Claim Number Four through the

Bankruptcy Plan, Peterson cured the Pre-Petition Default, which was then "fully and completely

settled." SAC, Doc. No. 34, at 5 ¶ 23, 8 ¶ 40. As a result, at that point, the legal basis for the

foreclosure sale was moot, and Wells Fargo "lacked the legal authority" to proceed with a

foreclosure sale. SAC, Doc. No. 34, at 5 ¶¶ 21, 23; 8 ¶¶ 37, 39-40; 9-10 ¶¶ 47-49.

      Although Peterson admits that she defaulted on post-petition payments and "understood"

lifting the stay would "start foreclosure proceedings anew," she challenges that Wells Fargo

returned to the Superior Court to give notice of its intent to proceed with a foreclosure sale that

the court had authorized nearly a decade earlier. *Id.* at 5 ¶ 24, 6-7 ¶ 31. In her view, the Pre-

Petition Default— and Wells Fargo's basis for obtaining an authorization of the foreclosure—

had been cured for five years*. Id*. at 8 ¶ 40. As a result, she thought that Wells Fargo would

initiate "new" proceedings rather than "reactivat[ing]" the *Foreclosure Case* and proceeding,

without any additional due process, to a foreclosure sale. *Id*. at 6-7 ¶ 31; *id.* at 8 ¶ 40.

      Peterson claims, in effect, that by improperly "reinstating" the *Foreclosure Case*, Wells

Fargo failed to adhere to North Carolina mortgage law requiring "noticing to the mortgage

holder, identifying the amounts of debt owed, noticing the potential for default, noticing the

ramifications of default, and other revised legal rights protections for debtors. . . ." *Id.* at 7 ¶ 32.

Consequently, she did not benefit from notice regarding "options for mortgage modification or

other repayment relief" and the opportunity to obtain such relief.  *Id.*  On that basis, she concludes that Wells Fargo violated CUTPA, North Carolina law, the settlement of Claim Number 4, and her constitutional rights to Equal Protection and to be free from a "Taking."  *Id.*

Construing Peterson's allegations accordingly, I conclude that I must dismiss Peterson's CUTPA claim for failure to satisfy the heightened pleading standard for claims of fraud and because she cannot state a CUTPA claim.

### a.   Count One Does Not Satisfy the Rule 9(b) Pleading Standard

Peterson's CUTPA claim sounds in fraud.  She asserts that Wells Fargo committed an unfair trade practice by providing "false" and "fraudulent notice [of the foreclosure sale], fraudulent sale terms, and fraudulent foreclosure by sale."  SAC, Doc. 34, at 2 ¶ 3, 3 ¶ 9-10, 16 ¶¶ 3, 9 ¶ 47, 10 ¶ 49, 16 ¶ 84.  Alleging "false" and "fraudulent" conduct, the claim must satisfy the heightened pleading standard pursuant to Federal Rule of Civil Procedure 9(b).  It does not.

Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  In contrast, claims asserting fraud must satisfy the "heightened pleading requirements" set forth in Federal Rule of Civil Procedure 9(b) to survive a motion to dismiss.  *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012).  Under Federal Rule of Civil Procedure 9(b), a claim sounding in fraud must be pled "with particularity;" that is, the plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Id.* (citation omitted).

In the Second Amended Complaint, Peterson does not identify specific ways in which Wells Fargo committed an unfair trade practice.  By simply "incorporat[ing] by reference"

earlier factual allegations, she does not explain with particularity what conduct was fraudulent nor why it was fraudulent.  Doc. No. 34, at 11 ¶ 53.  Even construing her allegations liberally and drawing all reasonable inferences in her favor, Peterson does not provide a sufficient recitation of "facts that give rise to a strong inference of fraudulent intent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Accordingly, I must dismiss Count One.

Generally, a claim dismissed pursuant to Rule 9(b) is dismissed without prejudice.  5A Charles Alan Wright & Arthur D. Miller, Federal Practice and Procedure § 1300 (4th ed.).  Nevertheless, because Peterson has already been granted leave to amend several times in this proceeding, I take the next step and address whether to dismiss Peterson's claim with prejudice.  To do so, I assess whether the claim would be futile after repleading, is in bad faith, or causes undue delay or prejudice.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  Because I conclude that Peterson fails to state a valid CUTPA claim on the merits and cannot do so, granting leave to amend the claim would be futile.  Accordingly, I dismiss the CUTPA claim with prejudice.

### b.  Peterson Cannot State a CUTPA Claim for Out-of-State Conduct

CUTPA provides a private right of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 41-110b."  Conn. Gen. Stat. § 42-100g(a).  Section 110b provides in pertinent part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  Section 110a defines "trade" and "commerce" as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state*."  Conn. Gen. Stat. § 42-110a(4) (emphasis added).

In the case at bar, the alleged CUTPA violations occurred in North Carolina.  Peterson's claim arises in connection with North Carolina real property, and principally relates to an attempted foreclosure sale scheduled to occur in North Carolina.  The fact that the allegations giving rise to the CUTPA claim occurred out-of-state is not necessarily fatal, because "CUTPA does not require that a violation actually occur in Connecticut" so long as "the violation is tied to a form of trade or commerce intimately associated with Connecticut or if, where Connecticut choice of law principles are applicable, those principles dictate application of Connecticut law." *Bulldog New York LLC v. Pepsico, Inc.*, 8 F. Supp. 3d 152, 166 (D. Conn. 2014) (citations omitted).  Here, however, Peterson does not satisfy either of the two conditions for bringing a CUTPA claim where the violation did not occur in Connecticut even if I liberally construe both her allegations and the statute itself.

First, Peterson does not establish a sufficient geographic nexus to state a CUTPA claim. Indeed, the Second Amended Complaint does not allege that the challenged foreclosure proceeding had any connection with Connecticut apart from the fact that Peterson resides in the state and the Bankruptcy Case took place in the District of Connecticut.  Reaching beyond the pleadings to the Note and Deed of Trust, the only nexus of the alleged CUTPA violation and Connecticut appears to be that Peterson and her co-debtors signed the Deed of Trust in Connecticut.  *See Bankruptcy Case,* Doc. No. 538-1, at 17-23.  There is some support under persuasive authority that one contract transaction constitutes a sufficient nexus, but that authority appears to be disfavored.  *See Pro-Fitness. Inc. v. Plankenhorn*, No. CV 950144106S, 1995 WL 774494, at *3 (Conn. Super. Ct. Dec. 6, 1995) (holding that, although the plaintiff did not state where the alleged misappropriation or tortious interference occurred, allegations that the contract was signed and negotiated in Connecticut were sufficient to satisfy CUTPA requirement that

trade or commerce be "in this state"); *but see Reyes v. Vertical Retail Sols., LLC*, No. 085003266S, 2011 WL 1168820, at *1 (Conn. Super. Ct. Feb. 24, 2011) ("The mere fact that one party to a contract resides or is located in Connecticut is insufficient to satisfy the definition of trade or commerce within this state.").

Although the Connecticut Supreme Court has not squarely addressed the issue of the geographic reach of a CUTPA claim, a recent pair of Connecticut Appellate and Supreme Court decisions provide insight.  In *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.,* the Appellate Court "decline[d] to give extraterritorial effect to § 42-110a(4) for actions taken in the pursuit of trade or commerce occurring wholly outside the state," because where the "the complained about activities did not involve the advertising, sale, rent, lease, offering for sale, rent or lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, and other article, commodity or thing of value in Connecticut," the CUTPA action was beyond the reach of the plain text of the statute.  146 Conn. App. 169, 200-01 (2013). The Connecticut Supreme Court criticized the Appellate Court's decision on other grounds, but it seemed to affirm that, though "Connecticut undoubtedly has an interest in applying its law to ensure that local businesses do not engage in unfair trade practices in this state," such interest is "not especially strong" where there is only "limited" contact between the parties in Connecticut. 322 Conn. 541, 561 (2016).

Applying that recent— if somewhat ambivalent— appellate authority and construing all inferences favorably, I hold that Peterson's allegations are insufficiently associated with Connecticut to give rise to a CUTPA claim.  In my view, Wells Fargo's contacts with Connecticut were limited to the signing of the Deed of Trust and the Bankruptcy Case.  That nexus is insufficient, especially in light of the fact that the crux of Peterson's CUTPA claim

arises from Wells Fargo's allegedly unfair conduct occurring in North Carolina arising out of a North Carolina foreclosure proceeding involving a North Carolina property.

Second, even though a plaintiff may state a CUTPA claim for out-of-state conduct where choice-of-law principles direct application of Connecticut law, no party to the case at bar has indicated that North Carolina law conflicts with CUTPA.  In such circumstances, a choice-of-law analysis is "inappropriate," and this Court should presume Connecticut law governs.  *See Cohen v. Roll-A-Cover, LLC*, 131 Conn. App. 443, 466 (2011); *W. Dermatology*, 322 Conn. at 558 n.13.

Nevertheless, for the purpose of illustrating why Peterson's CUTPA claim is not cognizable, I observe that choice-of-law principles would counsel applying North Carolina law.

For one, the Note and Deed of Trust contain an express choice-of-law provision, whereby "the Security Instrument shall be governed by federal law and the law of the jurisdiction in which the property is located," or North Carolina.  Doc. No. 538-1, at 13 ¶ 16.  Connecticut law favors enforcement of contractual choice-of-law provisions.  *Reichhold Chemicals, Inc. v. Hartford Accident & Indem. Co*., 252 Conn. 774, 788 (2000).  Accordingly, to any extent issues presented by this dispute directly implicate the Note and Deed of Trust, such issues would be governed by North Carolina law.

However, because the language of the choice-of-law provision is not broad enough to encompass Peterson's CUTPA claim, I must instead employ the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws to determine which law to apply to the CUTPA claim.  *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996); *Blakeslee Arpaia Chapman, Inc. v. Helmsman Mgmt. Services, Inc*., No. 443753, 2002 WL 172670, at *3 (Conn. Super. Ct. Jan. 9, 2002) (a CUTPA claim was not preempted by a contract with similar language); *W. Dermatology*, 322 Conn. 541 at 558 (the "most significant relationship"

approach).  On that basis, "'[t]he rights and liabilities of the parties with respect to an issue [in

tort] are determined by the local law of the state which, with respect to that issue, has the most

significant relationship to the occurrence and the parties.'"  *W. Dermatology*, 322 Conn. 541 at

558 (quoting Restatement (Second) of Conflict of Laws § 145).

After analyzing the most significant relationship to the allegations and the parties, I

would conclude that North Carolina law applies.  The analysis favors North Carolina law

because Peterson's alleged injury and the conduct causing it (the "reactivation" of the

*Foreclosure Case*, "false" notice of foreclosure sale, and "denial" of mortgage modification)

occurred in North Carolina and center on the Kure Beach Property.  Granted, neither Peterson

nor Wells Fargo are citizens of North Carolina, and Peterson signed the parties' agreement in

Connecticut.  But, taken together, the most significant relationship is with North Carolina.

Because neither of the conditions for bringing a CUTPA claim where the violation did

not occur in Connecticut is satisfied, Peterson cannot bring a CUTPA claim.  Accordingly, I

dismiss the CUTPA claim **with prejudice**.[4]

---

[4]       In the Second Amended Complaint, Peterson relies on *Soto v. Bushmaster Firearms International, LLC* to
support her CUTPA claim.  SAC, Doc. 34, at 11 (citing 331 Conn. 53 (2019)).  She posits that *Soto* stands for the
propositions that she has suffered an "ascertainable loss," and that Connecticut courts rule liberally on CUTPA
issues.  But *Soto* is inapposite to the case at bar for two reasons.
         For one, Peterson alleges neither wrongful advertising nor personal injuries.  *Soto* arose from the tragedy of
the Sandy Hook massacre in 2012.  The plaintiffs brought claims against gun manufacturers and retailers for
CUTPA violations on a wrongful advertising theory.  *Id.* at 65–66, 73, 99.  As a matter of first impression, the
Connecticut Supreme Court held that CUTPA "permits recovery for personal injuries that result directly from
wrongful advertising practices."  *Id.* at 110.
         Next, to the extent that Connecticut courts rule "liberally" on CUTPA claims, capaciousness is unwarranted
on these facts.  CUTPA is "remedial in character," therefore it "must be liberally construed in favor of those whom
the legislature intended to benefit."  *Cohen*, 131 Conn. App. at 464.  But the plain text of the statute indicates the
legislature intended to benefit those engaged in commerce in Connecticut.  Peterson's suit arises principally out of
commerce in North Carolina.  As a result, she is outside of CUTPA's protections.

2.  *North Carolina Unfair and Deceptive Trade Practices Act Claim*

Although I determined that Peterson cannot state a claim arising under CUTPA, I do not treat that determination as the end of the analysis regarding Peterson's unfair trade practices allegations.  Instead, I liberally construe Count One of the Second Amended Complaint and the allegations regarding the failed CUTPA claim to plead, in the alternative, a violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") or the North Carolina Debt Collection Act ("NCDCA").  N.C. Gen. Stat. § 75-1.1, *et seq.* (UDTPA); N.C. Gen. Stat. § 75-50, *et seq.* (NCDCA).

UDTPA and NCDCA are materially similar to CUTPA.  Like CUTPA, UDTPA renders unlawful "unfair or deceptive acts or practices in or affecting commerce. . . ."  N.C. Gen. Stat. § 75-1.1(a).  NCDCA renders unlawful "deceptive or misleading representation[s]" specifically related to debt collecting.  N.C. Gen. Stat. § 75-54.[5]  Both statutes provide a private right of action for violations.  N.C. Gen. Stat. §§ 75-16 (UDTPA), 75-56 (NCDCA).

To state a viable UDTPA claim, a plaintiff must allege three elements: (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused actual injury to the plaintiff.  *Burrell v. Sparkkles Reconstruction Co*., 657 S.E.2d 712, 717 (N.C. Ct. App. 2008).  With respect to the first prong, a practice is an "unfair trade practice" when it "offends established public policy as well as when the practice is immoral, unethical, oppressive,

---

[5] NCDCA may preclude a UDTPA claim, but the distinction between the two North Carolina laws is not material at this stage of the proceeding.  *See* N.C. Gen. Stat. § 75-56(a); *Musenge v. SmartWay of the Carolinas, LLC*, No. 3:15-CV-153 (RJC) (DCK), 2018 WL 4440718, at *5 (W.D.N.C. Sept. 17, 2018) (The NCDCA "constitutes the sole remedy for unfair and deceptive trade practices in the context of debt collection.").  "[T]o the extent that the alleged misconduct is outside the NCDCA, the NCDCA does not foreclose a separate [NCUDTPA] claim." *Thompkins v. Key Health Med. Sols., Inc*., No. 1:12-CV-613, 2015 WL 1292228, at *4 (M.D.N.C. Mar. 23, 2015).  At this stage, Peterson seems to have alleged facts sufficiently outside of the debt collection context to allow her claims to proceed.  *See Polanco v. HSBC Bank USA Nat'l Ass'n*, No. 3:17-CV-00466 (GCM), 2019 WL 2590964, at *6 (W.D.N.C. June 21, 2019) (allowing a UDTPA claim arising from the foreclosure context to survive the motion to dismiss stage, though noting it may be precluded based on later findings during fact discovery).

unscrupulous, or substantially injurious to consumers." *Marshall v. Miller,* 276 S.E.2d 397, 403 (N.C. 1981).  With respect to the second prong, that the practice was "in commerce," North Carolina courts recognize that an unfair practice relating to home loans and foreclosure is "in commerce" for purposes of UDTPA.  *See, e.g., Polanco v. HSBC Bank USA Nat'l Ass'n*, No. 3:17-CV-00466-GCM, 2019 WL 2590964 (W.D.N.C. June 21, 2019); *Self v. Nationstar Mortgage LLC*, No. 2:19-CV-3-D, 2019 WL 4734412, at *6 (E.D.N.C. Sept. 26, 2019).  With respect to the third prong, the defendant's unfair practice must have proximately caused the plaintiff's actual injury.

To state a viable NCDCA claim, a plaintiff must establish, first, that the "obligation owed [is] a 'debt;' second, the one owing the obligation [is] a 'consumer;' and third, the one trying to collect the obligation [is] a 'debt collector.'" *Waddell v. U.S. Bank Nat'l Ass'n*, 395 F. Supp. 3d 676, 682 (E.D.N.C. 2019) (quoting *Reid v. Ayers*, 531 S.E.2d 231, 233 (N.C. App. 2000)).  North Carolina courts construe home loans as debt, mortgagors as consumers, and mortgage servicers (including eligible mortgagees) as debt collectors.  *Id*.  After satisfying those threshold requirements, North Carolina courts then require that plaintiff satisfy the elements of a UDTPA claim.  *Id.*  Here, Peterson satisfies the threshold elements of a NCDCA claim because she took out a home loan from and serviced by Wells Fargo.  Therefore, I proceed with a UDTPA analysis.

Regarding UDTPA, I begin with the Chapter 45 statutory scheme that Peterson references, proceeding on the view that compliance with the statutory scheme is *prima facie* evidence that Wells Fargo did not "offend public policy" and therefore did not engage in an unfair trade practice.  *Cf. Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972) (quoting 29 Fed. Reg. 8355 (1964) for the proposition that a practice is unfair where

"without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness"). I determine that Peterson's UDTPA claim fails on the first prong because Wells Fargo complied with the statutory scheme, or that her claim fails on the third prong because she cannot establish that any potential noncompliance caused her or could cause her any injury.

      a.   Peterson Cannot State a UDTPA Claim Related to Chapter 45

In Count One, Peterson asserts that Wells Fargo "offended public policy," which I construe to refer back to her claim that Wells Fargo "knew or should have known that failing to adhere to revised portions of North Carolina state mortgage law (General Statutes Chapter 45)" was unlawful. *See* SAC, Doc. No. 34, at 7 ¶ 32 (emphasis omitted), 10 ¶ 51. On that basis, Peterson seems to state an unfair trade practices claim arising under North Carolina law. But Peterson cannot establish that Wells Fargo engaged in unfair trade practices as alleged.

      i.   Estoppel and Abstention Bar Re-Litigation of the Superior Court's Order Authorizing Foreclosure Sale

As a threshold matter, I want to make clear what this analysis will not address. The North Carolina Superior Court made the findings required by North Carolina General Statutes section 45-21.16, whereby it concluded that Wells Fargo could proceed with the foreclosure sale. Superior Court's Order Authorizing Foreclosure Sale, *Foreclosure Case* (N.C. Super. Ct. Dec. 7, 2009); *see also* SAC, Doc. No. 34, at 4 ¶ 16; *Bankruptcy Case*, Doc. No. 223, at 9-10 (observing same). The Superior Court's findings of fact and conclusions of law are binding on this Court pursuant to the doctrines of collateral estoppel and *Rooker-Feldman* abstention, and they may not be challenged in this proceeding.

Upon the filing and service of a notice of hearing on a trustee's request to foreclose pursuant to a power-of-sale, section 45–21.16(d) provides that the clerk of court in the county where the land is situated shall conduct a hearing at which "the clerk shall consider the evidence of the parties and may consider, in addition to other forms of evidence required or permitted by law, affidavits and certified copies of documents" to determine the existence of:

> (i) valid debt of which the party seeking to foreclose is the holder,
>
> (ii) default,
>
> (iii) right to foreclose under the instrument,
>
> (iv) notice to those entitled to such under subsection (b),
>
> (v) . . . that the pre-foreclosure notice under [N.C. Gen. Stat. §] 45–102 was provided in all material respects, and that the periods of time established by Article 11 of this Chapter have elapsed, and
>
> (vi) that the sale is not barred by [N.C. Gen. Stat. §] 45–21.12A,
>
> then the clerk shall authorize the mortgagee or trustee to proceed under the instrument, and the mortgagee or trustee can give notice of and conduct a sale pursuant to the provisions of this Article.

*Id.* (line spacing added). The clerk's decision may be appealed to the judge of the district or superior court having jurisdiction within ten days, which must conduct a *de novo* hearing to determine the specific findings of fact set forth by the statute. N.C. Gen. Stat. § 45–21.16(d1); *In re Garvey*, 772 S.E.2d 747, 751 (N.C. Ct. App. 2015). The judge may also "consider evidence of legal defenses tending to negate" any of the findings. *Locklear v. Fed. Home Mortgage Corp.*, No. 7:16-CV-344-D, 2017 WL 1737634, at *4 (E.D.N.C. May 1, 2017).

Before Peterson brought this lawsuit, the Superior Court made the required findings of fact and conclusions of law authorizing Wells Fargo, through the Substitute Trustee, to proceed with a foreclosure sale. Superior Court's Order Authorizing Foreclosure Sale, *Foreclosure Case* (N.C. Super. Ct. Dec. 7, 2009). The Superior Court's Order— in writing, signed by the judge,

and file-stamped by the clerk— was a final judgment of the Superior Court. *In re David A. Simpson, P.C.*, 711 S.E.2d 165, 169 (N.C. Ct. App. 2011) (citing N.C. Gen. Stat. § 7A-27(b)); N.C. R. Civ. P. 58.

To appeal a final judgment, an appellant must file a notice of appeal within thirty days. N.C. R. App. P. 3(c), (e). If a party fails to timely file a notice of appeal, the Superior Court judgment remains final and the party has generally waived its right to appellate review. *Duncan v. Duncan*, 742 S.E.2d 799, 801 (N.C. 2013) (citing N.C. Gen. Stat. § 1-279.1, N.C. R. App. P. 3). Thereafter, any issues regarding the validity of the debt and the Substitute Trustee's right to foreclose cannot be re-litigated. *Locklear*, 2017 WL 1737634, at *4.[6]

Here, Peterson does not allege that she appealed the Order, and the *Foreclosure Case* file contains no notice of appeal. As a result, Peterson's failure to timely file a notice of appeal rendered the Superior Court's findings of fact and conclusions of law final. She cannot explicitly or implicitly attempt to relitigate the Order and its contents in this Court.

Moreover, to any extent Peterson seeks to appeal the Superior Court's findings of fact and conclusions of law, this Court may not review or reject the Order. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (citing *Rooker v. Fid. Tr. Co.*, 263 U.S. 413

---

[6] I acknowledge that the preclusive effect of a section 45-21.16 order authorizing a power-of-sale foreclosure has recently become somewhat unsettled. In *In re Lucks*, the North Carolina Supreme Court held that "the Rules of Civil Procedure do not apply [to power-of-sale foreclosure] unless explicitly engrafted into the statute." 794 S.E.2d 501, 505 (2016). As a result, "[i]f the clerk or trial court does not find the evidence presented to be adequate to 'authorize' the foreclosure sale," then the finding "does not implicate res judicata or collateral estoppel in the traditional sense. . . ." *Id.* at 506. North Carolina courts have since "grappled with the correct interpretation" of *Lucks*, especially in cases in which the clerk or trial court authorized (rather than denied) a foreclosure sale. *In re Worsham*, 833 S.E.2d 239, 247 (N.C. Ct. App. 2019). However, relevant here, North Carolina courts have generally held that preclusion doctrines *do* apply when a foreclosure sale *is* authorized. *E.g.*, *Gray v. Federal Nat'l Mortgage Assoc.*, 830 S.E.2d 652, 657 (N.C. Ct. App. 2019) ("*Lucks* simply stands for the proposition that the doctrines of res judicata and collateral estoppel do not apply in situations where foreclosure was *not authorized* by the clerk of court.") (emphasis original); *see also Vicks v. Ocwen Loan Servicing, LLC*, 3:16-cv-00263, 2017 WL 2490007, at *2 (W.D.N.C. June 8, 2017); *In re Burgess*, 575 B.R. 330, 344 (Bankr. E.D.N.C. 2017). Because the North Carolina Supreme Court has not yet settled the issue, I defer to the weight of authority and conclude that the section 45-21.16 order in this case at bar is preclusive.

(1923), and *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)); *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005) (holding that the *Rooker-Feldman* doctrine prohibits federal district courts from exercising subject matter jurisdiction over "suits that are, in substance, appeals from state-court judgments").

Accordingly, Peterson may not explicitly or implicitly challenge the sufficiency of the findings of fact nor the conclusions of law in the Superior Court's Order Authorizing Foreclosure Sale in this proceeding.

       ii.   <u>Pursuant to North Carolina General Statutes § 45-21.22, Superior Court's Order Authorizing Foreclosure Sale *Also* Authorized the Scheduled 2018 Foreclosure Sale</u>

Having established that this Court must treat the Superior Court's Order as binding, I further observe that the Order authorized the 2018 foreclosure sale as a matter of law.

North Carolina statute expressly addresses the interaction between a bankruptcy stay and the power-of-sale foreclosure process, providing that:

> When, after the entry of any authorization or order by the clerk of superior court pursuant to [N.C. Gen. Stat. §] 45-21.16 and before the expiration of the 10-day upset bid period, the foreclosure sale is stayed pursuant to 11 U.S.C. § 105 or 362, and thereafter the stay is lifted, terminated, or dissolved, the trustee or mortgagee shall not be required to comply with the provisions of [N.C. Gen. Stat. §] 45-21.16, but shall advertise and hold the sale in accordance with the provisions of [N.C. Gen. Stat. §§] 45-21.16A, 45-21.17, and 45-21.17A.

N.C. Gen. Stat. § 45-21.22(c).  Courts construing the plain text of the statute hold that a lender may proceed with a previously authorized foreclosure sale upon the lifting of a bankruptcy stay. *E.g.*, *In re Harris*, No. 15-81295, 2016 WL 6649152, at *4 (Bankr. M.D.N.C. Apr. 13, 2016) ("[T]here is no dispute that [the substitute trustee] was authorized by the clerk to conduct the sale and that the originally authorized sale was stayed and postponed due to the Debtor's prior bankruptcy case.  After dismissal of the Debtor's earlier bankruptcy, the automatic stay

terminated with respect to the Debtor and the property. . . .  [The substitute trustee] was

authorized to foreclose. . . .  Once [the substitute trustee] properly received that authority, there is

nothing in the statute to suggest that [the substitute trustee] needed further authorization to

foreclose. . . .").

Here, after the Superior Court issued the Order and before the bid period began, the

*Foreclosure Case* was automatically stayed.  It remained stayed until the stay was lifted by

operation of law.  As a result, when the stay was lifted, the Substitute Trustee could proceed with

a foreclosure sale without initiating a new special proceeding in the Superior Court, without

holding a new hearing before the clerk, and without filing any additional motions to proceed with

a foreclosure sale.  To proceed lawfully, the Substitute Trustee merely needed to have complied

with notice and publication requirements related to the sale.

Accordingly, Wells Fargo was only required to initiate a new special proceeding if (1)

Peterson was somehow protected from the foreclosure by the terms of the Note and Deed of

Trust, or (2) she complied with the statutory requirements to terminate a power-of-sale.  I

address each of the two bases in turn, explaining why neither provides is sufficient for Peterson

to state a UDTPA claim.

*First*, to any extent that Peterson seeks to state UDTPA claim arising from breach of the

Note and Deed of Trust, she cannot.

In North Carlina, a borrower does not have a statutory right to reinstate (or cure) a default

after a lender accelerates a loan.  Rather, a power-of-sale provision in a deed of trust is a

"contractual arrangement" that "confers upon the trustee or mortgagee the power to sell the real

property mortgaged without any order of court in the event of a default."  *In re Michael*

*Weinman Associates Gen. P'ship*, 424 S.E.2d 385, 388 (N.C. 1993) (cleaned up).  Because

power-of-sale foreclosure is contractual in nature, a borrower is only entitled to termination of

the foreclosure sale based on a reinstatement pursuant to the terms of the borrower's agreement

with the lender.

Here, Peterson does not state a claim for breach of the Note and Deed of Trust, *i.e.,* by

pleading a cause of action for breach.  But her assertion that her loan had been reinstated and her

reference to communications regarding the settlement of the Pre-Petition Default seems to refer

to Paragraph 19 of the Deed of Trust, which provides for a borrower's right to reinstate after

acceleration upon satisfaction of the following conditions:

> Those conditions are that Borrower: (a) pays Lender all sums which then
> would be due under this Security Instrument and the Note as if no
> acceleration had occurred; (b) cures any default of any other covenants or
> agreements; (c) pays all expenses incurred in enforcing this Security
> Instrument, including, but not limited to, reasonable attorneys' fees,
> property inspection and valuation fees, and other fees incurred for the
> purpose of protecting Lender's interest in the Property and rights under
> this Security Instrument; and (d) takes such action as Lender may
> reasonably require to assure that Lender's interest in the Property and
> rights under this Security Instrument, and Borrower's obligation to pay the
> sums secured by this Security Instrument, shall continue unchanged. . . .

*See* SAC, Doc. No. 34, at 5 ¶ 22 (arguing that certain of Wells Fargo's representations were

"affirmations of loan reinstatement"); Deed of Trust, Doc. No. 538-1, at 13-14 ¶ 19.  This claim

may or may not be meritorious standing alone— Peterson has not raised it, and I am not in a

position to decide.  Rather, I consider the rights arising under the Deed of Trust to the extent

necessitated by my construction of Count One as a UDTPA claim.

As a matter of law, Peterson cannot state a UDTPA claim based on breach of Paragraph

19 of the Deed of Trust.  "[A] mere breach of contract . . . does not rise to an unfair or deceptive

trade practice."  *Kelly v. Georgia-Pac. LLC*, 671 F. Supp. 2d 785, 799 (E.D.N.C. 2009).  Rather,

to state a UDTPA claim, Peterson must plausibly allege "substantial aggravating circumstances,"

*Waddell*, 395 F. Supp. 3d at 684, or circumstances that are "separate and apart from a breach of

contract," *Suntrust Bank v. Bryant/Sutphin Properties*, LLC, 732 S.E.2d 594, 599 (N.C. Ct. App. 2012). She makes no such showing here. Accordingly, Peterson cannot state a UDTPA claim on the basis that the power-of-sale was somehow terminated pursuant to a term of the Note and Deed of Trust.

*Second*, Peterson cannot state a claim arising under a statutory right to termination of the power-of-sale. North Carolina law provides that a "[a] power-of-sale is terminated if, prior to the time fixed for a sale, or prior to the expiration of the time for submitting any upset bid after a sale or resale has been held, payment is made or tendered of (1) [t]he obligation secured by the mortgage or deed of trust, and (2) [t]he expenses incurred with respect to the sale or proposed sale which in the case of a deed of trust also include compensation for the trustee's services. . . ." N.C. Gen. Stat. § 45-21.20.

Here, despite what Peterson seems to believe, curing the Pre-Petition Default and arrearage did not "extinguish" the power-of-sale as a matter of law. *See* SAC, Doc. No. 34, at 2 ¶ 5, 13 ¶ 65, 14 ¶ 78. Although Peterson cured the Pre-Petition Default, she did not satisfy the obligations required to be entitled to termination of the power-of-sale. In tendering the stipulated amount due to cure the Pre-Petition Default, or $29.046.54, Peterson paid less than the stipulated total obligation under the loan, or $125,043.76. *See* SAC, Doc. No. 34, at 10 ¶ 50 (distinguishing the "post-petition collections" from the "final lump sum payment"); *id.* at 23 (proof of claim setting forth both amounts). As a result, Peterson did not tender payment for the entire obligation secured by the deed of trust, the authorized power-of-sale was not terminated by operation of law, and she was not entitled to a new foreclosure proceeding. Until Peterson paid off the debt in full and Wells Fargo withdrew the Notice of Foreclosure sale on July 13, 2018, no intervening event terminated the power-of-sale. Accordingly, Peterson cannot state a UDTPA

34

claim relating to section 45-21.20 because the power-of-sale was not terminated by the cure of the Pre-Petition Default.

Taken together, the Superior Court's Order authorized Wells Fargo to proceed with a foreclosure sale, and the Order was still in effect when the bankruptcy stay was lifted. Peterson provides no basis under UDTPA with which to undermine that authority. Said differently, Peterson's repeated assertion that Wells Fargo acted wrongfully by "returning" to North Carolina to proceed with the nonjudicial power-of-sale foreclosure is wrong as a matter of law, and Peterson cannot state a UDTPA claim on that basis. For the foregoing reasons, it would be futile to grant Peterson leave to amend. Accordingly, I dismiss the claim **with prejudice**.

### iii.   Wells Fargo's Noncompliance with North Carolina General Statutes section 45.21-22(c), If Any, Did Not Cause Peterson Injury

To lawfully proceed with the sale authorized pursuant to North Carolina General Statutes section 45.21-16, the Substitute Trustee was required to re-advertise the property for sale "in accordance with the provisions of [N.C. Gen. Stat. §§] 45-21.16A, 45-21.17, and 45-21.17A." N.C. Gen. Stat. § 45-21.22(c); *see also Beneficial Mortgage Co. of N. Carolina, Inc. v. Barrington & Jones Law Firm, P.A.*, 595 S.E.2d 705, 712 (N.C. Ct. App. 2004) (holding that "[u]pon the 'lifting' of the stay, the foreclosing trustee was to pursue foreclosure by again advertising and selling the property in accordance with the provisions of N.C. Gen. Stat. §§ 45–21.16A, 45–21.17, and 45–21.17A"). Peterson does not state a UDTPA claim on the basis that Wells Fargo violated section 45-21.22, because she does not allege that the Substitute Trustee failed to comply with the notice terms set forth in the statute. Even if she had, however, she cannot establish that Wells Fargo caused her any injury as a result.

Section 45-21.16A enumerates the required "contents of the notice of sale," including: a description of the deed of trust; information regarding the forthcoming sale; a legal description of

the real property; the terms of the sale; any notice provisions required by the deed of trust; a warning that the property is sold subject to taxes and special assessments; and a warning that the property is sold subject to any subordinate rights or interests.  N.C. Gen. Stat. § 45-16A. Peterson never alleges that Wells Fargo's Amended Notice of Foreclosure Sale was defective with respect to any of those requirements.  Moreover, Peterson includes the Amended Notice of Foreclosure Sale as an exhibit to the Second Amended Complaint, and the notice satisfies each requirement on its face.  *See* Doc. No. 34, at 43-44.

Section 45.21-17 governs publication of the notice of sale, requiring compliance with any notice requirements in the deed of trust; posting the notice of sale in a designated public area at least twenty days before the date of sale; publishing the notice of sale in the newspaper at least once per week for two successive weeks in the newspaper in the county in which the property is situated, or one that circulates in that county; and mailing the notice to specified parties at least twenty days before the date of sale.  N.C. Gen. Stat. § 45-21.17.  Firstly, Peterson does not allege that the Substitute Trustee failed to satisfy a notice term of the Deed of Trust.  Secondly, she does not allege that the Substitute Trustee failed to post the notice of sale in the designated public area; indeed, she suggests that the Substitute Trustee complied with this requirement.  *See* SAC, Doc. No. 34, at 13 ¶ 65 ("Defendant . . . post[ed] said notice [foreclosure sale] at a courthouse in North Carolina").  Thirdly, she does not allege that the Substitute Trustee failed to publish the notice in the newspaper; rather, she suggests that the Substitute Trustee did so.  *See* SAC, Doc. No. 34, at 8 ¶ 38 (the "newspaper notice was published in North Carolina"), 13 ¶ 65 ("Defendant . . . publish[ed] said notice in the local news"); *see also id.* at 46 (a copy of the publication).  Fourthly, she does not allege that the Substitute Trustee failed to mail the notice of the foreclosure; instead, she indicates that the Substitute Trustee satisfied this requirement.  *See*

36

SAC, Doc. No. 34, at 7 ¶ 34 (alleging she received the Amended Notice of Foreclosure Sale on May 23, 2018, sixteen days before the scheduled date of sale and plausibly within the "mailbox rule" window).  In sum, Peterson did not properly allege that the Substitute Trustee violated the section 21-21.22(c) notice requirements to state a claim of a practice "offending public policy" for purposes of UDTPA.

The issue, then, is whether Peterson could amend her complaint to state a UDTPA claim related to section 21-21.22(c).  On that point, to any extent that Peterson can establish that Wells Fargo's conduct failed to comply with the notice requirements of section 21.21-22(c), she would still be unable to carry her burden with respect to the third prong of a UDTPA claim: causation and injury.  To successfully plead that Wells Fargo's failure to provide sufficient notice regarding re-advertising the foreclosure sale caused her injury, Peterson must also allege that *but for* Wells Fargo's non-compliance she would not have experienced an injury.  But, here, no foreclosure sale occurred.  Therefore, Peterson has already been availed of the remedy at law: no foreclosure sale. *See Beneficial Mortgage Co.*, 595 S.E.2d at 712 (nullifying a foreclosure sale in violation of the bankruptcy stay provision of section 21-21.22(c)).

Because Peterson cannot allege that any defective notice relating to the re-advertising of the Kure Beach Property for sale caused her any injury, she does not and cannot state a UDTPA claim.  For the foregoing reasons, and because granting leave to amend would be futile, I dismiss this claim **with prejudice**.

      iv.   <u>In the Alternative, Peterson Cannot State a Claim for Defective Notice<br>Pursuant to North Carolina General Statutes § 45-102</u>

In the alternative, Peterson may intend to link her UDTPA claim to North Carolina General Statutes section 45-102, regulating notice requirements relating to foreclosure proceedings.  The Second Amended Complaint is not especially clear, but there is some

suggestion that Peterson seeks to state such a claim.  Specifically, she associates the allegedly

unlawfully "reinstated" foreclosure proceeding with failure to receive notice informing her of the

opportunity to negotiate a workout or other foreclosure alternative, arguing that Wells Fargo

"knew or should have known that failing to adhere to . . . [North Carolina] General Statutes

Chapter 45[] regarding noticing to the mortgage holder" broke the law and denied her "notice of

. . . repayment or mortgage modification programs she might have qualified for. . . ."  *See* SAC,

Doc. No. 34, at 7 ¶ 32, 10 ¶ 51, 16 ¶ 83.

     North Carolina General Statutes section 45-102 sets forth statutory pre-foreclosure notice

requirements, providing that a lender must send written notice and certain information to the last

known address of the borrower at least forty-five days prior to the filing of notice of a hearing.

N.C. Gen. Stat. § 45-102.  The statute provides in relevant part that:

> At least 45 days prior to the filing of a notice of hearing in a foreclosure
> proceeding on a primary residence, mortgage servicers of home loans shall
> send written notice by mail to the last known address of the borrower to
> inform the borrower of the availability of resources to avoid foreclosure,
> including . . .
>
> (3) A statement that the borrower may have options available other than
> foreclosure and that the borrower may discuss available options with the
> mortgage lender, the mortgage servicer, or a counselor approved by the
> U.S. Department of Housing and Urban Development.
>
> (4) The address, telephone number, and other contact information for the
> mortgage lender, the mortgage servicer, or the agent for either of them
> who is authorized to attempt to work with the borrower to avoid
> foreclosure.
>
> (5) The name, address, telephone number, and other contact information
> for one or more HUD-approved counseling agencies operating to assist
> borrowers in North Carolina to avoid foreclosure.
>
> (6) The address, telephone number, and other contact information for the
> State Home Foreclosure Prevention Project of the Housing Finance
> Agency.

*Id.* Compliance is a necessary condition for the clerk of court or the Superior Court to find that due process has been satisfied and that a lender may proceed with a power-of-sale foreclosure. N.C. Gen. Stat. § 45-21.16(d).

Here, the Superior Court made a specific finding of fact that Peterson had received proper notice pursuant to section 45-102. *See* Superior Court's Order Authorizing Foreclosure Sale, *Foreclosure Case* (N.C. Super. Ct. Dec. 7, 2009) ("6. The Respondent was mailed the pre-foreclosure notice required under N.C. Gen. Stat. §45-102 more than 45 days prior to the filing of the Notice of Hearing; and 7. The pre-foreclosure notice requirements under N.C. Gen. Stat. §45-102 were met. . . .").  Peterson is estopped from re-litigating that finding, and this Court must abstain from hearing any attempts to appeal it.  In addition, as discussed, the Superior Court's Order authorized Wells Fargo to proceed with a foreclosure sale after the bankruptcy stay had been lifted.  Accordingly, the satisfactory Chapter 45 notice was still in effect after the bankruptcy stay was lifted.  *Cf. Matter of Davis*, 928 S.E.2d 526, 2019 WL 2762946, at *4 (N.C. Ct. App. 2019) (unpublished) (holding under analogous but less persuasive facts that a lender need not re-send the foreclosure notice when it files a proper pre-foreclosure notice, dismisses a judicial foreclosure action, and later files a new notice of foreclosure for the same property).

Accordingly, to any extent to which Peterson's UDTPA claim relates to North Carolina General Statutes section 45-102, she cannot state a claim for relief.  For the foregoing reasons, it would be futile to grant Peterson leave to amend.  Accordingly, I dismiss the claim **with prejudice**.

> b.  Peterson Cannot State a UDTPA Claim Relating to Federal Mortgage Modification Programs

In the alternative, Peterson seems to attempt to state a claim for violations of the federal Home Affordable Modification Program ("HAMP") and the Troubled Asset Relief Program

("TARP"), that she "should have been . . . afforded the right and proper procedure to formally receive notice of new debt or mortgage default and offered repayment or mortgage modification programs she might have qualified for" under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, or under the federal U.S. Trustee Program, TARP, and HAMP.  SAC, Doc. No. 34, at 15 ¶ 81, 16 ¶ 83.  These programs do not individually provide a cause of action, but North Carolina courts have indicated a willingness to allow plaintiffs to raise HAMP violations under UDTPA and NCDCA.  *See In re Rutledge*, 510 B.R. 491, 509 (Bankr. M.D.N.C. 2014); *In re Hinson*, 481 B.R. 364, 376 (Bankr. E.D.N.C. 2012).  Accordingly, I liberally construe Count One to raise a claim relating to HAMP and TARP.

Here, Peterson cannot raise a claim arising from a HAMP violation under North Carolina law, because she alleges no facts indicating that she was either eligible for or sought a modification under HAMP.  *Cf. In re Hinson,* 481 B.R. at 376 (HAMP-related UDTPA claim arose from defects in the HAMP application process).  Therefore, she cannot establish that Wells Fargo caused her any injury.  *See In Re Rutledge,* 510 B.R. at 497 (denying a HAMP-related UDTPA claim wherein the plaintiff had not relied on lender's representations).  I draw the same conclusion regarding any allegation that her rights under TARP were impaired.

Accordingly, I dismiss the claim relating to federal mortgage modification programs.  Moreover, because Peterson already pleaded a claim relating to federal mortgage modification programs and did not cure its deficiencies upon repleading (nor, substantively, is it clear that she could), I dismiss the claim **with prejudice**.  *See* Doc. No. 1, at 5-6 ¶ 31, 14 ¶ 96.

   c.   Peterson Cannot State A UDTPA Claim Related to Constitutional Rights

To any extent that Peterson alleges that Wells Fargo violated Peterson's right to Equal Protection or its conduct constituted a "Taking" in violation of due process, that claim fails.

First, as Wells Fargo observes, no actual foreclosure sale depriving her of such rights took place.

Doc. No. 36, at 3.  Second, even if the foreclosure had occurred, Peterson does not state a claim

upon which relief can be granted.

The "Fifth Amendment's Due Process Clause and equal protection principles [only]

apply to *federal* . . . actors."  *Gyadu v. Bainer*, No. 3:19-CV-01120, 2021 WL 2073919, at *3 n.2

(D. Conn. May 24, 2021) (citing *Skelly v. I.N.S.*, 168 F.3d 88, 91 (2d Cir. 1999).  And the

Fourteenth Amendment generally only applies to state government actors.  U.S. Const. amend.

XIV ("No *State* shall . . . deprive any person of life, liberty, or property, without due process of

law. . . ."); *Civil Rights Cases*, 109 U.S. 3, 11, 17 (1883) ("It is State action of a particular

character that is prohibited. . . . The wrongful act of an individual . . . is simply a private

wrong. . . .").  The Supreme Court has identified several factors relevant to an attribution of

private activity as state action.

> We have, for example, held that a challenged activity may be state action
> when it results from the State's exercise of "coercive power," when the
> State provides "significant encouragement, either overt or covert," or
> when a private actor operated as a "willful participant in joint activity with
> the State or its agents." We have treated a nominally private entity as a
> state actor when it is controlled by an "agency of the State," when it has
> been delegated a public function by the State, when it is "entwined with
> government policies," or when government is "entwined in [its]
> management of control."

*Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)

(internal citations omitted).

Here, Wells Fargo is a private actor acting in its private interest.  *Harrell v. Wells Fargo

Bank, N.A.,* No. 19-CV-01417 (JMV), 2019 WL 7207490, at *8 (D.N.J. Dec. 27, 2019) ("Wells

Fargo Bank is a private entity, not a state actor.").  None of the *Brentwood* factors support a

finding that Wells Fargo was engaging in action attributable to the state or acting under color of

state law.  Accordingly, neither the Fifth nor Fourteenth Amendments apply to the conduct of Wells Fargo at issue in Peterson's complaint.

For the foregoing reasons, and because granting leave to amend would be futile, I dismiss this claim **with prejudice**.

### 3.  *Breach of Settlement Agreement*

In Count Two, Peterson alleges that Wells Fargo breached a settlement agreement arising out of the settlement of Claim Number 4 in the *Bankruptcy Case*.  SAC, Doc. 34, at 12-13.  Specifically, Peterson represents that she and Wells Fargo came to an agreement by settling the Pre-Petition Default and arrearage in consideration for her withdrawing her objection to Claim Number 4, and that the Bankruptcy Court held that the settlement rendered the bank's prepetition claims moot.  *Id*. at 12 ¶ 63.  She alleges that Wells Fargo breached that agreement by "resurrecting the extinguished prepetition collection file (#09-19658) and related court case (#09 SP 681), and falsely us[ing] them as a legal means or vehicle to issue and serve a so-called 'amended' notice of foreclosure. . . ."  *Id*. at 13 ¶ 65.  Wells Fargo argues that Count Two fails to state a claim for breach of contract.  Doc. 27, at 2.  In addition, because Peterson's breach claim incorporates allegations of fraud, Wells Fargo argues that Count Two fails the heightened pleading standard under Rule 9(b).  Doc. No. 28, at 15.  I agree with Wells Fargo.

#### a.  Count Two Does Not Satisfy the Rule 9(b) Pleading Standard

Like Peterson's UDTPA claim, her breach of contract sounds in fraud.  SAC, Doc. No. 34, at 13 ¶ 65.  Alleging "fraudulent" conduct, her claims must satisfy the higher pleading standard pursuant to Federal Rule of Civil Procedure 9(b).  For the same reasons I have already explained with regard to Count One, the breach of contract claim does not.  Therefore, I must dismiss the breach of contract claim.

      b.   Peterson Cannot State a Breach of Contract Claim Arising from the Settlement of Claim Number 4

Under Connecticut law, "[t]he elements of a breach of contract claim are the [1] formation of an agreement, [2] performance by one party, [3] breach of the agreement by the other party, and [4] damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014). "[W]ith any issue of contract interpretation, [the Court] begin[s] with the language of the contract." *Poole v. Waterbury*, 266 Conn. 68, 90 (2003). Count Two fails because Peterson cannot establish a term of the agreement that Wells Fargo breached.

As a threshold matter, Peterson seems to assume that the settlement of the Pre-Petition Default and arrearage, without more, sufficed to terminate Wells Fargo's power-of-sale. I have already addressed how that assumption errs with respect to North Carolina state foreclosure law. Relevant here, that assumption is also fallacious with respect to court procedure. Under the North Carolina Rules of Civil Procedure, proceedings related to a settled claim may be disposed in several ways— each requiring a party to take an affirmative step. A civil matter may be voluntarily dismissed by the plaintiff, after notice to the court; voluntarily dismissed by both parties, after notice to the court of a stipulation of dismissal; or, at the request of the plaintiff, by an order of a judge. N.C. R. Civ. P. 41(a). No such showing has been made.

Here, when notifying the Superior Court that the *Foreclosure Case* was automatically stayed due to Peterson's bankruptcy petition, Wells Fargo expressly indicated that it was "neither dismissing [the] action nor waiving any rights which it has under this foreclosure." Notice of Bankruptcy Petition, *Foreclosure Case* (N.C. Super. Ct. June 28, 2010). After that, there is no evidence that Wells Fargo notified the Superior Court of its intent to withdraw the Fo*reclosure Case* due to the settlement of the Pre-Petition Default and arrearage, or that the Superior Court was notified of any stipulation of the parties to withdraw the case arising from the settlement of

43

the Pre-Petition Default and related arrearage.  Moreover, due to the contractual and nonjudicial nature of power-of-sale foreclosure, North Carolina courts view lenders' rights to continue with authorized foreclosure proceedings especially capaciously, holding that "a [lender's] decision to refrain from [a power-of-sale foreclosure] is not a 'dismissal' but simply a withdrawal of the notice." *In re Lucks*, 794 S.E.2d at 505.  *Lucks* seems to suggest an even higher threshold of affirmative intent to terminate a power-of-sale than is generally required under the N.C. Rules of Civil Procedure to dismiss a civil proceeding.  Therefore, any assumption that the settlement of the Pre-Petition Default and arrearage, without more, somehow terminated the *Foreclosure Case* is necessarily mistaken.  As a result, Peterson has the burden of demonstrating that Wells Fargo in fact agreed to terminate the power-of-sale and withdraw the foreclosure proceeding.

Turning to the merits of Peterson's breach of settlement claim, Peterson does not— and cannot— allege a contract term that Wells Fargo breached in the settlement of the Pre-Petition Default and arrearage.  Peterson includes the allegedly breached agreement with the Second Amended Complaint.  *See* SAC, Doc. 34, at 23.  The document is a proof of claim filed by Wells Fargo in the *Bankruptcy Case*, *a.k.a.* Claim Number 4.  *Id.*  It illustrates that Peterson's "arrearage and other charges" pursuant to the settlement of Claim Number 4 were $29,046.54, and that the "Amount of Secured Claim" was $125,043.76.  *Id.*  But, as Wells Fargo correctly observes, the proof of claim merely represented the parties' stipulation regarding the amount of Peterson's pre-petition arrearage.  Doc. 18, at 31.  On its face, it did not "promise to dismiss the North Carolina foreclosure action" nor "relieve [Peterson] of the obligation to make her post-petition mortgage payments."  *Id.*  (emphasis omitted).  In other words, the settlement of Claim Number 4 did not manifest the parties' mutual assent to terminate the power-of-sale, nor alter Peterson's extant obligation to maintain payments to Wells Fargo outside the Bankruptcy Plan.

Peterson admits that she failed to comply with her obligation to make post-petition mortgage payments. SAC, Doc. No. 34, at ¶ 24. Therefore, I agree with Wells Fargo that it did not breach its settlement regarding Peterson's prepetition debt by pursuing a lawfully authorized foreclosure sale arising from Peterson's default on her obligation to maintain post-petition payments.

Accordingly, I dismiss the claim for breach of settlement. Moreover, because Peterson already pleaded this claim and did not cure its deficiencies upon repleading (nor, substantively, is it clear that she could), I dismiss the claim **with prejudice**. *See* Doc. No. 1, at 12.

### 4. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

In Count Three, Peterson alleges Wells Fargo violated the implied covenant of good faith and fair dealing regarding the settlement of Claim Number 4 because she "should have been . . . afforded the right and proper procedure to formally receive notice of new debt or mortgage default and offered repayment or mortgage modification programs she might have qualified for" under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, or under the federal U.S. Trustee Program, TARP, or HAMP. SAC, Doc. No. 34, at 15 ¶ 81, 16 ¶ 83. Wells Fargo argues that Peterson fails to and cannot state a plausible claim of the implied covenant because she does not and cannot allege a breached contract term. Doc. 27, at 2. In addition, because this claim incorporates allegations of fraud, Wells Fargo argues that it fails to satisfy the Rule 9(b) heightened pleading standard. Doc. 28, at 16.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 210 Conn. 150, 154 (1989) (citation omitted). In order to prove a breach of the implied covenant of good faith and fair dealing, a plaintiff must show that the defendant acted in bad faith to "impede[ ] the plaintiff's right to receive benefits . . . under the contract." *De La Concha of Hartford v. Aetna Life Ins. Co*., 269

Conn. 424, 433 (2004).  But "[m]ost courts decline to find a breach of the covenant apart from a breach of an express contract term."  *Fin. Freedom Acquisition, LLC v. Griffin*, 176 Conn. App. 314, 340 (2017).  Count Three fails because Peterson cannot establish that she had a right to receive benefits in the agreement.

A case on which Wells Fargo relies, *Financial Freedom Acquisition, LLC v. Griffin*, is instructive for the case at bar.  176 Conn. App. 314 (2017).  There, the Connecticut Appellate Court addressed a claim for breach of the implied covenant of good faith and fair dealing arising out of a foreclosure.  The borrower's mortgage agreement defined the borrower's death as a maturity event triggering acceleration of the loan, unless the lender and the borrower-decedent's representative agreed in writing to cooperate fully in selling the property.  *Id.* at 318.  In *Griffin*, the lender and the executrix of the decedent's estate had not entered into such an agreement, so the lender accelerated the loan.  *Id.*  Upon nonpayment, the lender initiated a foreclosure action. *Id.*  As a special defense and counterclaim, the executrix pleaded that the lender violated the implied covenant of good faith and fair dealing.  *Id.* at 321.  The trial court concluded that the lender had established a *prima facie* case of foreclosure and denied the executrix's special defense and counterclaim.  *Id.* at 322.

On appeal, the Connecticut Appellate Court affirmed the trial court's conclusion that the executrix had failed to meet her burden with respect to the special defense and counterclaim.  *Id.* at 335.  It held that "[t]he covenant of good faith and fair dealing is not implicated by conduct that does not impair contractual rights."  *Id.* at 340 (cleaned up).  Therefore, without the written agreement to cooperate required by the terms of the note, the executrix sought to enforce obligations on the lender that did not exist, and she could not state a claim.  *Id.* at 342-43.

Here, Peterson cannot allege that Wells Fargo impaired her rights under a contract because, as explained, the settlement agreement did not terminate the extant power of sale nor preclude Wells Fargo from holding Peterson to account for her failure to make post-petition payments.  Like the executrix in *Griffin*, Peterson seeks to enforce obligations that did not exist.

Moreover, to the extent that Peterson appears to argue that Wells Fargo violated an implied duty of loan modification or refinancing pursuant to the federal programs, the settlement agreement on its face "d[id] not guarantee or discuss any right to refinance."  *Forte v. Citicorp Mortgage, Inc*., 90 Conn. App. 727, 734 (2005).  Therefore, Wells Fargo did not violate the covenant for failing to allow her to do so.  *Id*. at 733-34.

Accordingly, I dismiss the claim for breach of the implied covenant of good faith and fair dealing.  Moreover, because Peterson already pleaded this claim and did not cure its deficiencies upon repleading (nor, substantively, is it clear that she could), I dismiss the claim **with prejudice**.  *See* Doc. No. 1, at 13.

### 5.  *Negligent Misrepresentation*

In Count Four, Peterson alleges that Wells Fargo committed the tort of negligent misrepresentation.  Specifically, she alleges that "[b]y right and virtue of that valid and enforceable settlement" of the Pre-Petition Default and arrearage, "Defendant had no reasonable basis to later represent to anyone that any part of that old settled pre-petition collection file (#09-19658) or related court case (# 09 SP 681) had not been settled, paid, or extinguished" or that it "could be reactivated."  SAC, Doc. 34, at 17 ¶ 93.  She also alleges that Wells Fargo negligently "contribut[ed] to" and "ma[de] false, incomplete, or misleading statements to a substitute trustee (Brock & Scott), to a self-represented party, and to legal counsel representing family members" and "in allowing the notice and publication . . . relative to an 'amended' foreclosure and property

47

sale." *Id* at 17 ¶ 95.  Wells Fargo argues that Peterson fails to state a claim for negligent

misrepresentation and that her claim is time-barred.  Doc. 27, at 2; Doc. No 18, at 36.  I agree.

First, Peterson fails to state a claim for negligent misrepresentation, because she does not

allege that she relied on any alleged misrepresentation.  In Connecticut, the elements of a claim

for negligent misrepresentation are: "(1) that a misrepresentation of fact was made; (2) that the

party making it knew or should have known that it was untrue; (3) that the other party reasonably

relied upon it; and (4) that the latter suffered pecuniary harm as a result thereof."  *United*

*Rentals, Inc. v. Wagner*, No. 3:07-CV-00519, 2008 WL 2167021, at *3 (D. Conn. May 22,

2008).

Here, Peterson's claim rests on the idea that third parties, such as the Bankruptcy Court

or potential buyers of the Kure Beach Property, relied on the alleged misrepresentations.  But

Peterson cannot state a claim for negligent representation based on the reliance of non-parties to

this lawsuit.   Thus, this claim fails on the merits and must be dismissed.

Second, it would be futile to grant Peterson leave to amend the negligent

misrepresentation claim, because the claim is barred by the statute of limitations.  A statute of

limitations bars a legal action if the limitation period expires before the action is initiated.  *See,*

*e.g., Webb v. Semple*, No. 3:17-CV-01623 (SRU), 2018 WL 5299706, at *5 (D. Conn. Oct. 25,

2018).  Connecticut has a two-year statute of limitations for claims of negligent

misrepresentation.  *OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*,

503 F. Supp. 2d 490, 504 (D. Conn. 2007); Conn. Gen. Stat. § 52-584.

Here, the statute of limitations bars Peterson's claim.  From the pleadings, it is clear that

Peterson had inquiry notice of the potential property sale as of mid-May 2018, when her brother

alerted her to a phone call regarding a pre-foreclosure sale.  SAC, Doc. No. 34, at 6 ¶¶ 29-30.

She received actual notice of the foreclosure sale via a letter from the Substitute Trustee on May 23, 2018. *Id*. at 7 ¶ 34 (referring to Doc. No. 34, at 42). Therefore, Peterson's limitations period began to toll at least as of May 23, 2018. Peterson brought this lawsuit more than two years later, on June 4, 2020. Thus, Peterson brought her lawsuit after the limitations period had expired and her claim is time-barred.

For the foregoing reasons, and because granting leave to amend would be futile, I dismiss Peterson's negligent misrepresentation claim **with prejudice**.

6. *Wrongful Foreclosure*

Peterson next alleges that Wells Fargo committed wrongful foreclosure. SAC, Doc. 34, at 20. Wells Fargo argues that Peterson's claim for wrongful foreclosure is barred for lack of subject matter jurisdiction and moot because the foreclosure did not take place. Doc. 27, at 2. I agree that Peterson cannot state a claim.

a. Choice and Principles of Law

"[C]ourts need not address choice of law questions *sua sponte*." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991). If no party raises a conflict of law, or if a party raises a conflict but fails to carry its burden of demonstrating an actual conflict, then Connecticut courts presume that the applicable law is Connecticut law. *W. Dermatology*, 322 Conn. at 558 n.13. Here, both parties presumed that Connecticut law applied to Peterson's claims; therefore, I too have presumed that Connecticut law governs throughout this opinion. Nevertheless, I have identified an actual conflict of law regarding Peterson's wrongful foreclosure claim. Because Peterson proceeds *pro se*, I choose to address the conflict *sua sponte*.

There is an actual conflict between Connecticut and North Carolina law regarding a claim of wrongful foreclosure. In Connecticut, wrongful foreclosure is not cognizable. *See, e.g., Fed.*

*Nat. Mortg. Ass'n v. Alves*, No. CV 980353897, 1999 WL 1566475, at *1 (Conn. Super. Ct. Dec. 23, 1999) (striking a counterclaim for wrongful foreclosure but recognizing that the theory may constitute a special defense); *In re Residential Capital, LLC*, No. 12-12020(MG), 2015 WL 1087746, at *1 (Bankr. S.D.N.Y. March 9, 2015) (construing a wrongful foreclosure claim as a CUTPA claim). On the other hand, North Carolina has long recognized a cause of action for wrongful foreclosure. *E.g., Burnett v. Supply Co.*, 104 S.E. 137 (N.C. 1920); *Smith v. Greensboro Joint Stock Land Bank*, 196 S.E. 481 (N.C. 1938). Accordingly, there is an actual conflict, and a choice-of-law analysis is warranted.

Where a conflict of laws arises, a federal court applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989). In Connecticut, the applicable "conflict of laws rule depends upon the nature of the plaintiff's claim." *Reclaimant Corp. v. Deutsch*, 332 Conn. 590, 599 (2019). Connecticut has long applied the law of the situs to mortgages, *Belmont v. Cornen*, 48 Conn. 338, 346 (1880), and "foreclosure-related issues that do not specifically affect an interest in the land itself 'are determined . . . by the law which governs the debt for which the mortgage was given,'" *Retained Realty, Inc. v. McCabe*, 376 F. App'x 52, 56 (2d Cir. 2010) (quoting Restatement (Second) of Conflict of Laws § 229)).

Because Peterson's claim arises from a Deed of Trust on North Carolina real property and the deed of trust contains an express choice-of-law provision that it "shall be governed by" North Carolina law, North Carolina law governs the wrongful foreclosure claim and Peterson's wrongful foreclosure claim is cognizable.

b.   Peterson Cannot State A Claim for Wrongful Foreclosure

However, even though North Carolina recognizes the cause of action, Peterson

nevertheless cannot state a claim of wrongful foreclosure for two reasons.

First, North Carolina courts will not find the elements of wrongful foreclosure satisfied

where a lender forecloses due to the homeowner's arrearage.  *See Douglas v. Pennamco, Inc.,*

331 S.E.2d 298, 300 (N.C. Ct. App. 1985).  Here, Peterson undisputedly defaulted on her

obligation to maintain payments, and her loan was in arrears.

Second, there is no cognizable claim for wrongful foreclosure when no foreclosure sale

has taken place.  *Patterson v. DAC Corp. of North Carolina*, 310 S.E.2d 783, 786 (N.C. Ct. App.

1984).  The claim "accrues when the mortgagee conveys the property to a third party."  *Id.*

(quoting *Davis v. Doggett*, 194 S.E. 288, 291 (N.C. 1937)).  As a result, there is no cause of

action for wrongful *attempted* foreclosure.  *Id.*  Here, Peterson alleges that a foreclosure sale was

"scheduled" and "attempt[ed]," but no foreclosure sale occurred.  SAC, Doc. No. 34, at 10 ¶ 50.

Without a foreclosure sale, there can be no wrongful foreclosure.

For the foregoing reasons, and because granting leave to amend would be futile, I dismiss

Peterson's wrongful foreclosure claim **with prejudice**.

## IV.   Conclusion

For the foregoing reasons, I **grant** Wells Fargo's motions to dismiss, Docs. No. 28, 36.

Specifically:

(1) I grant Wells Fargo's motion to dismiss Count One, Peterson's Connecticut Unfair

Trade Practices Act claim, and **dismiss with prejudice**.

(2) I grant Wells Fargo's motion to dismiss Count One, construed in the alternative as a

North Carolina Unfair and Deceptive Trade Practices Act claim, and **dismiss with prejudice**.

(2) I grant Wells Fargo's motion to dismiss Count Two, Peterson's breach of settlement claim, and **dismiss with prejudice**.

(3) I grant Wells Fargo's motion to dismiss Count Three, Peterson's breach of implied covenant of good faith and fair dealing claim, and I dismiss **with prejudice**.

(4) I grant Wells Fargo's motion to dismiss Count Four, Peterson's negligent representation claim, and **dismiss with prejudice**.

(5) I grant Wells Fargo's motion to dismiss Count Five, Peterson's wrongful foreclosure claim, and **dismiss with prejudice**.

The Clerk is directed to enter judgment for Wells Fargo and close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 31st day of March 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge